**No. 25-3767**

# In the United States Court of Appeals for the Ninth Circuit

JUSTIN DONAHUE, JASON CAMPBELL, & JACOB GOSS,
*Plaintiffs-Appellants,*

v.

UNION PACIFIC RAILROAD COMPANY,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:21-cv-00448 (The Hon. Maxine M. Chesney)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

JAMES H. KASTER
LUCAS KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
(612) 256-3200

ANTHONY S. PETRU
GAVIN SCOTT BARNEY
HILDEBRAND, MCLEOD & NELSON LLP
5335 College Avenue
Suite 5A
Oakland, CA 94618
(510) 451-6732

MATTHEW W.H. WESSLER
MICHAEL SKOCPOL
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

JESSICA E. GARLAND
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336

October 6, 2025                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of authorities ................................................................................... iii

Introduction ............................................................................................... 1

Jurisdictional statement ............................................................................ 3

Statement of the issues ............................................................................. 3

Statement of the case ............................................................................... 4

     I.     Statutory and regulatory background ...................................... 4

          A.    The Americans with Disabilities Act ......................... 4

          B.    The Federal Railroad Administration's regulations governing conductors' color vision requirements ...................... 8

     II.    Factual background ................................................................ 12

          A.    Union Pacific's color vision field test ...................... 19

          B.    Mr. Donahue's, Mr. Campbell's, and Mr. Goss's experience working for Union Pacific ...................... 21

     III.   Procedural history ................................................................. 19

          A.    The *Harris* class litigation ....................................... 19

          B.    Mr. Donahue's, Mr. Campbell's, and Mr. Goss's ADA action ............................................................................ 21

Standard of review ................................................................................. 27

Summary of argument ............................................................................ 28

Argument ................................................................................................ 33

     I.     The district court erred in granting summary judgment against Mr. Donahue ......................................................................... 33

i

A. Because Union Pacific's test facially discriminates based on perceived disability, it is a per se ADA violation unless the railroad can prove its business necessity affirmative defense.......................................................................... 35

B. The district court erred by requiring evidence of animus to prove discrimination and by applying a burden-shifting framework to a facial discrimination case ................. 40

II. Mr. Campbell and Mr. Goss raised a genuine dispute of material fact about whether they are "qualified individuals" ............46

Conclusion ......................................................................... 55

# TABLE OF AUTHORITIES

## Cases

*Albertson's, Inc. v. Kirkingburg,*
    517 U.S. 555 (1999)....................................................................... 24, 47

*American Association of Retired Persons v. Farmers Group, Inc.,*
    943 F.2d 996 (9th Cir. 1991).................................................................39

*American Pipe & Construction v. Utah,*
    414 U.S. 538 (1974) .............................................................................. 22

*American Title Insurance Co. v. Lacelaw Corp.,*
    861 F.2d 224 (9th Cir. 1988) ................................................................51

*Amini v. Oberlin College,*
    440 F.3d 350 (6th Cir. 2006)................................................................38

*Anthoine v. North Central Counties Consortium,*
    605 F.3d 740 (9th Cir. 2010) ...............................................................53

*Babb v. Wilkie,*
    589 U.S. 399 (2020) ............................................................................ 42

*Bates v. United Parcel Service,*
    511 F.3d 974 (9th Cir. 2007) (en banc)..........................................*passim*

*Blankinship v. Union Pacific Railroad Co.,*
    2024 WL 2988209 (9th Cir. 2024) .................................................22, 23

*Bohner v. Union Pacific Railroad Co.,*
    2021 WL 3363063 (E.D. Mo. Aug. 3, 2021).........................................43

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ............................................................................ 42

*Brownfield v. City of Yakima,*
    612 F.3d 1140 (9th Cir. 2010) ................................................................7

*Carrillo v. Union Pacific Railroad Co.,*
    2022 WL 3224000 (W.D. Tex. Aug. 9, 2022) ..................................... 42

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................. 28

*Chapman v. Pier 1 Imports (U.S.) Inc.,*
  631 F.3d 939 (9th Cir. 2011) ...................................................... 41

*DeFries v. Union Pacific Railroad Co.,*
  104 F.4th 1091 (9th Cir. 2024) ............................................ *passim*

*Donahue v. Union Pacific Railroad Co.,*
  2024 WL 2988223 (9th Cir. June 14, 2024) ................................. 22

*EEOC v. BNSF Railway Co.,*
  902 F.3d 916 (9th Cir. 2018) ................................................ *passim*

*EEOC v. Dolgencorp, LLC,*
  899 F.3d 428 (6th Cir. 2018) ................................................ 30, 41

*Giddings v. Greyhound Lines Inc.,*
  609 F. App'x 457 (9th Cir. 2015) ............................................... 52

*Harris v. Union Pacific Railroad Co.,*
  329 F.R.D. 616 (D. Neb. 2019). ....................................... 16, 17, 20, 21

*Harris v. Union Pacific Railroad Co.,*
  953 F.3d 1030 (8th Cir. 2020) ................................................... 21

*Healey v. Southwood Psychiatric Hospital,*
  78 F.3d 128 (3d Cir. 1996) ................................................... 37, 45

*Hill v. Walmart Inc.,*
  32 F.4th 811 (9th Cir. 2022) .................................................... 54

*International Union, United Automobile, Aerospace & Agriculture Implement Workers
  of America, UAW v. Johnson Controls, Inc.,*
  499 U.S. 187 (1991) ............................................................. 42

*Interstellar Starship Services, Limited v. Epix Inc.,*
  184 F.3d 1107 (9th Cir. 1999) .............................................. 32, 54

*Jackson v. Union Pacific Railroad Co.,*
  2021 WL 1726895 (S.D. Iowa Mar. 29, 2021) ............................... 42

iv

*Kleiber v. Honda of America Manufacturing, Inc.*,
    485 F.3d 862 (6th Cir. 2007) ............................................................ 40

*Lui v. DeJoy*,
    129 F.4th 770 (9th Cir. 2025) ........................................................... 38

*Lyle v. Secretary of Health & Human Services*,
    700 F.2d 566 (9th Cir. 1983) ....................................................... 3, 52

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ......................................................................... 38

*McGregor v. National Railroad Passenger Corp.*,
    187 F.3d 1113 (9th Cir. 1999) ................................................... 30, 42

*Mills v. Union Pacific Railroad Co.*,
    2024 WL 185246 (D. Idaho Jan. 16, 2024) ..................................... 50

*Murray v. UBS Security, LLC*,
    601 U.S. 23 (2024) ........................................................................... 42

*Nall v. BNSF Railway Co.*,
    917 F.3d 335 (5th Cir. 2019) .......................................................... 45

*Nigro v. Sears, Roebuck & Co.*,
    784 F.3d 495 (9th Cir. 2015) .......................................................... 54

*Opara v. Yellen*,
    57 F.4th 709 (9th Cir. 2023) .............................................. 30, 44, 45

*Oswalt v. Resolute Industries, Inc.*,
    642 F.3d 856 (9th Cir. 2011) .......................................................... 27

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ........................................................................... 4

*Piercy v. Maketa*,
    480 F.3d 1192 (10th Cir. 2007) .................................................. 38, 45

*Reidt v. County of Trempealeau*,
    975 F.2d 1336 (7th Cir. 1992) ........................................................ 38

*Rizzo v. Children's World Learning Centers, Inc.*,
    84 F.3d 758 (5th Cir. 1996) ........................................................38

*Rodriguez v. ConAgra Grocery Products Co.*,
    436 F.3d 468 (5th Cir. 2006) ....................................................42

*Rohr v. Salt River Project Agricultural Improvement and Power District*,
    555 F.3d 850 (9th Cir. 2009) ..............................................37, 40

*Snead v. Metropolitan Properties & Casualty Insurance Co.*,
    237 F.3d 1080 (9th Cir. 2001) ...................................................46

*Trans World Airlines, Inc. v. Thurston*,
    469 U.S. 111 (1985) .................................................................35

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002).................................................................. 6

*Uzun v. City of Santa Monica*,
    54 F.4th 595 (9th Cir. 2022) ....................................................54

*Vazquez v. County of Kern*,
    949 F.3d 1153 (9th Cir. 2020) ..................................................54

*Villalobos v. TWC Administration LLC*,
    720 F. App'x 839 (9th Cir. 2017)..............................................46

**Statutes**

28 U.S.C. § 1291..........................................................................… 3

28 U.S.C. § 1331..........................................................................… 3

42 U.S.C. § 12101.......................................................................…3, 4

42 U.S.C. § 12102 ...............................................................…*passim*

42 U.S.C. § 12111............................................................ 6, 28, 37, 47

42 U.S.C. § 12112 ...............................................................…*passim*

42 U.S.C. § 12113 ...............................................................…5, 6, 7

49 U.S.C. § 20135 ................................................................................7

49 U.S.C. § 20163 ................................................................................ 8

**Regulations**

49 C.F.R. § 242.1 ................................................................................. 8

49 C.F.R. § 242.101 ............................................................................. 8

49 C.F.R. § 242.103 ......................................................................8, 32, 53

49 C.F.R. § 242.117 ...................................................................... *passim*

49 C.F.R. § 242.201 ............................................................................. 8

49 C.F.R. Pt. 242, Appendix B ........................................................ 8, 11

49 C.F.R. Pt. 242, Appendix D ...................................................... *passim*

**Other authorities**

Best Practices for Designing Vision Field Tests for Locomotive Engineers
    or Conductors,
    80 Fed. Reg. 73122-01 (Nov. 24, 2015) ........................................ *passim*

*Causes of Color Vision Deficiency*,
    National Eye Institute (last updated Jan. 30, 2025) ........................... 8

Geeky Medics,
    *Colour Vision Assessment using Ishihara Charts - OSCE Guide*, YouTube (May
    13, 2020) ................................................................................... 9

*Company Overview*,
    Union Pacific Railroad Co. (May 15, 2025) ................................... 12

Goodwell, Oklahoma Accident Report
    (National Transportation Safety Board, Jun. 18, 2013) ...................... 13, 14, 49, 53

Dr. Neitz Expert Report in *Harris v. Union Pacific Railroad Co.*,
    *U.S. Equal Employment Opportunity Commission v. Union Pacific Railroad Co.*,
    No. 23-3030 (D. Minn. Mar. 31, 2025), ECF No. 93-4 ...................... 20

*Procedures for Testing Color Vision: Report of Working Group 41,*
National Research Council (US) Committee on Vision (1981) ........................ 10

## INTRODUCTION

Plaintiffs Justin Donahue, Jason Campbell, and Jacob Goss were train conductors for Defendant Union Pacific. For years, they performed their jobs capably and without incident, and also proved that they could accurately see colored railroad signals under real-world working conditions by passing Union Pacific's "field test." But in 2016, Union Pacific scrapped its longstanding procedures and began requiring conductors to decipher signals from a novel device that it dubbed the "Light Cannon." Union Pacific imposed that new test even as the company's own experts warned that it "lacks the necessary scientific and occupational validation," and so might misidentify employees as having color vision impairments even if they actually have normal color vision. 3-ER-348. Indeed, when Mr. Donahue, Mr. Campbell, and Mr. Goss were forced to take the new and unvetted "Light Cannon" test, each of them failed, despite their long track records of seeing colored railroad signals just fine. As Union Pacific's experts had warned, that anomalous result was not a valid measure of their ability to do their jobs. And Union Pacific has admitted—insisted, actually—that their vision remained unchanged since they passed its prior test. But Union Pacific fired all three of them anyway, solely because the Light Cannon test inaccurately branded them as having a visual disability.

Union Pacific's firing of Mr. Donahue, Mr. Campbell, and Mr. Goss is a textbook example of using "qualification standards, employment tests or other selection criteria that screen out or tend to screen out" employees "on the basis of disability" or a "perceived" disability. 42 U.S.C. §§ 12112(b)(6), 12102(3)(A). According to the plain text of the ADA, that sort of facial discrimination is unlawful when used to bar otherwise-qualified individuals, unless the employer can show that use of the discriminatory test is a "business necessity." *Id.* § 12112(b)(6). As this Court held in *Bates v. United Parcel Service*, that means that once a qualified plaintiff establishes that they were screened out due to a disability, they have carried their burden to show facial discrimination, and the only remaining question is whether the employer can show business necessity. 511 F.3d 974, 988 (9th Cir. 2007) (en banc).

But the district court didn't apply that controlling law. Instead, the district court invented a requirement to show "animus" that the text of the ADA does not impose, and that *Bates* forecloses. And it then compounded that error by demanding that Mr. Donahue show that Union Pacific's reason for his firing was pretextual, applying a burden-shifting framework that *Bates* made clear does not apply to cases of facial discrimination like this one. Correcting those errors is enough to reverse the district court's judgment as to Mr. Donahue.

The district court made another error as to Mr. Campbell and Mr. Goss. In granting Union Pacific summary judgment on their claims, the district court said

that they had additionally failed to show they are qualified for the job. But that conclusion overlooked ample evidence in the record demonstrating that their vision is just as good as when they passed Union Pacific's prior field test. Considered in the light most favorable to them, that evidence shows that they could have passed a federally-compliant vision test if only Union Pacific had provided one—and that they were therefore qualified individuals. *See Lyle v. Sec'y of Health & Hum. Servs.*, 700 F.2d 566, 568 (9th Cir. 1983). In holding otherwise, the district court impermissibly weighed evidence at summary judgment, so the judgments against Mr. Campbell's and Mr. Goss's claims should be reversed as well.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; 3-ER-435. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court granted final judgment on all claims. 1-ER-18. The district court entered its order granting summary judgment to Union Pacific on May 13, 2025. *Id.* The plaintiffs timely noticed this appeal on June 12, 2025. 3-ER-450–52; *see* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether evidence of a facially discriminatory screening test is sufficient to carry the plaintiff's burden to show discrimination "on the basis of disability" under

42 U.S.C. § 12112(b)(6), as this Court held in *Bates v. United Parcel Service*, 511 F.3d at 988, or whether a plaintiff must instead present evidence of animus and establish that the employer's stated reasons for firing them are pretextual, as the district court held here.

2. Whether a reasonable inference arises that a plaintiff was a "qualified individual" under the ADA when the summary judgment record establishes that they were qualified in the past and that their condition has not changed since.

## STATEMENT OF THE CASE

### I.     Statutory and regulatory background

### A.     The Americans with Disabilities Act

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).[1] Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities," and that this discriminatory exclusion of disabled people is "a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life," including employment. *Martin*, 532 U.S. at 675.

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

4

Title I of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to" their employment. 42 U.S.C. § 12112(a). This prohibition on discriminatory employment practices includes the use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." *Id.* § 12112(b)(6). In prohibiting discrimination "on the basis of disability," the statute equally covers discrimination against individuals who have an actual disability and those who do not but are nevertheless "regarded as having such an impairment." 42 U.S.C. § 12102(1)(C).

Congress has made unusually clear that it intends these provisions to have broad sweep. Among other updates to the statutory text, the 2008 ADA amendments clarified that discrimination based on disability can occur no matter whether a disability is "actual or perceived," and no matter whether a perceived disability "limit[s] a major life activity." 42 U.S.C. § 12102(3)(A); *see EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 924 (9th Cir. 2018).[2] And the ADA amendments evinced a special focus on the visually-impaired: Congress inserted a new provision specifically prohibiting

---

[2] When a plaintiff claims discrimination based on actual disability under § 12102(1)(A), the plaintiff is required to show that the "physical or mental impairment" at issue "substantially limits one or more major life activities." But when a plaintiff claims they were "regarded as" disabled by the employer, Congress has expressly clarified that it does not matter "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(a)(3)(A).

"qualification standards … based on an individual's uncorrected vision." 42 U.S.C. § 12113(c). So, stitching the relevant provisions together: An employer discriminates "on the basis of disability" when it imposes "employment tests" that "screen out" qualified employees who, based on the test results, are "regarded as" having a "physical or mental impairment"—regardless of whether that impairment is "actual or perceived." 42 U.S.C. §§ 12102(a)(3)(A), 12112(a), 12113(a)–(c).

Although this broad definition of disability discrimination reflects Congress's determination to aggressively root out irrational exclusion of the disabled from employment in all its forms, Congress also sought to ensure that Title I would not "demand action beyond the realm of the reasonable." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). As relevant here, Congress relied on two aspects of the statute to strike that balance.

First, the statute only prohibits discrimination against "a qualified individual." 42 U.S.C. § 12112(a). To state a claim for a violation of the ADA, therefore, an employee must prove *both* that he was discriminated against on the basis of actual or perceived disability, *and* that he is a "qualified individual." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (en banc). A "qualified individual" is "an individual who can perform the essential functions of" the job. 42 U.S.C. § 12111(8). Determining that an employee is qualified is itself a two-step inquiry: (1) the employee must demonstrate that he has the "requisite skill, experience, education and other

6

job-related requirements" of the position; and (2) that he can perform the "fundamental job duties of the employment position." *Bates*, 511 F.3d at 990 (quoting 29 C.F.R. §§ 1630.2(m), (n)(1)). "Although the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions, … an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." *Id.* at 991.

Second, the statute establishes an affirmative "business necessity" defense. 42 U.S.C. §§ 12112(b)(6), 12113(a); *see Bates*, 511 F.3d at 994–95. The business necessity defense authorizes an employer to use employment standards that exclude workers based on disability if the standard is (1) "job-related," (2) "consistent with business necessity," and (3) cannot be satisfied by providing a reasonable accommodation instead. *Bates*, 511 F.3d at 995. "The employer bears the burden of demonstrating business necessity." *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010). Accordingly, "[w]hen an employer asserts a blanket safety-based qualification standard—beyond the essential job function—that is not mandated by law" to screen out a person with a disability, "the employer—not the employee—bears the burden of showing that the higher qualification standard is job-related and consistent with business necessity." *Bates*, 511 F.3d at 992–93 (citing 42 U.S.C. § 12113(a)).

**B.    The Federal Railroad Administration's regulations governing conductors' color vision requirements.**

Federal law requires professional licensing and certification of railroad employees who will be involved in the operation of trains, including locomotive engineers and—as relevant here—conductors. *See* 49 U.S.C. §§ 20135 (engineers), 20163 (conductors). The Federal Railroad Administration implements that mandate by promulgating regulations related to licensing and certification. *See* 49 C.F.R. § 242.1 *et seq*. The regulations "prescribe[] minimum Federal safety standards," *id.* § 242.1(b), but they largely delegate to individual railroads the responsibility to decide the particulars of their own certification regimes, *see id.* §§ 242.101, 242.103(a); 49 C.F.R. Pt. 242, App'x B.

One thing the regulations do require is that the certification regime ensure that "conductors have the necessary vision and hearing acuity." 49 C.F.R. Pt. 242, App'x B (describing 49 C.F.R. § 242.117). One of the tasks of a railroad conductor is reading multicolored railroad traffic signals. 1-ER-22. As a result, the job requires a certain level of color vision acuity—not perfect color vision, but, as the FRA has recognized, color vision sufficient to recognize and distinguish colored signals. 1-ER-28; 3-ER-437. The FRA therefore requires railroads to test conductors for color vision deficiency. 49 C.F.R. § 242.117.

After a candidate is certified as having adequate color vision, they are given a recertification test every three years. 49 C.F.R. § 242.201. More frequent tests are

8

generally not necessary because color vision deficiency is usually inherited, and inherited "color vision won't get any better or worse over time." *Causes of Color Vision Deficiency*, Nat'l Eye Inst. (last updated Jan. 30, 2025), https://perma.cc/KXM8-99BR; Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors, 80 Fed. Reg. 73122-01, 73123 (Nov. 24, 2015). But if an individual has an eye injury or a disease like glaucoma, their color vision can change. *Id.* In such a case, where a conductor's "vision condition is [not] stable," the FRA recommends that they be "monitored more frequently." FRA Best Practices, 80 Fed. Reg. at 73122, 73125.

Federal regulations provide multiple testing methods a railroad may adopt to determine whether its employees can "safely perform as a conductor" based on their actual abilities and not just perceived disabilities. 49 C.F.R. Pt. 242, App'x D(4). The color vision certification process prescribed by FRA regulations allows railroads to choose which testing method to use through a two-step process. It starts with an FRA-approved color vision acuity examination—including, for instance, the "Ishihara test," which requires candidates to examine a series of colored disks to identify what numbers or figures they depict.[3] 3-ER-433; 3-ER-438; 49 C.F.R. Pt. 242, App'x D(2). An Ishihara test-taker is given "a series of numbers or other images

---

[3] Although the name of the test may be unfamiliar, the disks used in it are more well known. *See, e.g.*, Geeky Medics, *Colour Vision Assessment using Ishihara Charts - OSCE Guide*, YouTube (May 13, 2020), https://perma.cc/56Y4-S7RK.

embedded in dot patterns [on a colored disk], with the numbers or images distinguishable from the surrounding dots only by color contrast." *DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1100 n.2 (9th Cir. 2024).

If an employee does not pass that initial "color vision acuity test[,]" FRA regulations require railroads to determine that person's ability to "safely perform as a conductor" by administering either a second "approved scientific screening test or a field test." 49 C.F.R. Pt. 242, App'x D(4). Approved scientific screening tests must be verified in a "rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication." FRA Best Practices, 80 Fed. Reg. at 73124. The other option, a secondary field test, "is a test performed outdoors under test conditions that reasonably match actual operating or working conditions." *Id.* Inconsistent results—where, for instance, an individual fails the Ishihara test but passes a secondary test—are not uncommon and reflect research showing that the Ishihara tests "are not entirely successful at diagnosis of congenital red-green defects." *Procedures for Testing Color Vision: Report of Working Group 41*, Nat'l Rsch. Council (US) Comm. on Vision (1981), https://perma.cc/F5ZC-SZ7E; 2-ER-301–02 (Union Pacific's testing consultant, Dr. Ivan, recognizing the "risk of false positive[s]" for "the Ishihara test"—it can "reject[] somebody who is normal"; individuals with "normal," or no color vision deficiency, "can fail" it).

"The intent" of the field test is "to provide an examinee with at least one opportunity to prove that a … vision test failure does not mean the examinee cannot safely perform as a conductor." 49 C.F.R. Pt. 242, App'x D(4). That's because the "FRA's longstanding view is that there are some people who, despite not meeting the vision threshold in [an initial vision acuity test like the Ishihara test] have sufficient residual visual capacity to safely perform as a locomotive engineer or conductor." FRA Best Practices, 80 Fed Reg. at 73123.

FRA regulations do not prescribe how a secondary field test is to be conducted or direct which test to use; railroads instead have discretion to make that choice. 49 C.F.R. § 242.117. The FRA does, however, require that any field test be "valid, reliable, and comparable," and that it be "performed outdoors under test conditions that reasonably match actual operating or working conditions." FRA Best Practices, 80 Fed. Reg. at 73124. In this context, "validity means the degree to which a test actually measures … whether a person can recognize and distinguish between colors of the types of railroad signals." *Id.* at 73125. "Reliability means the degree of reproducibility of the test results." *Id.* And "[c]omparability means the testing procedures are fairly administered and the test results are uniformly recorded." *Id.* Although regulations leave the particular design of any "field test" up to the railroad, railroads are required to submit a description of their program "for

11

testing and evaluating previously certified conductors" to the FRA. 49 C.F.R. Pt. 242, App'x B, D(4).

## II.   Factual background

### A.   Union Pacific's color vision field test.

Union Pacific is one of the nation's largest railroad carriers. It employs tens of thousands of employees and has an in-house staff that assists in conducting FRA certifications for color vision acuity. *Company Overview*, Union Pac. RR. Co. (May 15, 2025), https://perma.cc/HFT8-AR2Y; 2-ER-136; 3-ER-393; 3-ER-397.

In 1999, Union Pacific implemented a secondary color vision field test for employees subject to FRA vision-testing requirements who failed an initial test like the Ishihara exam. 3-ER-394. That secondary field test examined employees' ability to read actual railroad signals by assessing whether they could accurately identify ten wayside signal configurations. 3-ER-382; 3-ER-394–95; 3-ER-434. Union Pacific administered this secondary field test for over fifteen years. *See* 3-ER-434; 3-ER-438.

In 2016, however, Union Pacific changed its approach. 1-ER-23. The reason, Union Pacific said, was a 2012 train accident in Goodwell, Oklahoma. 2-ER-115. An investigation by the National Transportation Safety Board revealed several probable causes of the accident: "the conductor's disengagement from his duties," "the lack of positive train control," an engineer's fatigue due to "his schedule" that only provided "irregular opportunities to sleep," and the "engineer's inability to visually

detect and recognize the approach and stop signal aspects of wayside railroad signals." Goodwell, Oklahoma Accident Report iv, 11–15 (National Transportation Safety Board, Jun. 18, 2013), https://perma.cc/LU4S-SYSH [hereinafter NTSB Report]; FRA Best Practices, 80 Fed. Reg. 73122-01.

The NTSB's report included a detailed discussion of the engineer's visual impairments. It explained that the problem with the engineer's vision was not just a result of genetic color deficiency, but rather that his vision had deteriorated in the years before the crash because of "multiple eye conditions." NTSB Report at 17. "In childhood he had cataract surgery, which required removing the lenses from both of his eyes." *Id.* at 17–18. He also developed "glaucoma in both eyes" and later experienced a "retinal detachment." *Id.* All three conditions "required various procedures" and "surgeries" on his eyes—totaling "12 separate procedures" in the three years before the crash, including a surgery in 2011 to "remove the membranes" on his eyes. *Id.* at 18–20. All in all, the engineer had not just a color vision problem but also a "distant visual acuity impairment." FRA Best Practices, 80 Fed. Reg. at 73123.

Notwithstanding these long-documented issues with the engineer's vision, the NTSB also found that Union Pacific had failed to properly follow its own "policy for verifying visual acuity." NTSB Report at 21. The railroad failed to test him on almost half of the "wayside signal configurations" that its own color vision "field test

protocol" required. *Id.* And when the engineer "complain[ed] of difficulty seeing train signals," Union Pacific chose not to "perform [the] follow-up testing recommended by its own chief medical officer." *Id.* at 21–24. The agency therefore concluded that, had the engineer been "reevaluated in 2010 as planned by [Union Pacific] or after he self-reported his vision treatments and test results, it is unlikely that he would have continued to be medically certified and the collision may have been avoided." *Id.* at 24.

Following the Goodwell crash and NTSB investigation, the FRA issued a "Best Practices" report for the railroad-administered field tests contemplated in its certification regime. *See* FRA Best Practices, 80 Fed. Reg. 73122-01. The agency did not prohibit Union Pacific (or any railroad) from employing the field test that Union Pacific had used for years leading up to the crash; nor did it change the FRA's regulation that left the actual implementation of a field test up to the railroad; nor did it alter its "longstanding interpretation of" what is required by a field test: "that the test offered by a railroad must be a valid, reliable, and comparable." *Id.* at 73124–27.

Instead, the report focused on the NTSB's finding that Union Pacific "did not adhere" to the company's own "field test protocol" and "failed to [timely] reevaluate the engineer's vision ... despite the UP medical examiner's written determination that it was necessary ... due to the engineer's chronic, progressive eye conditions."

14

*Id.* at 73123. To prevent similar failures, the FRA made a list of "best practices" that it "encourage[d] each railroad to consider adopting" and focused on ensuring that each railroad adhered to its "field test protocol." *Id.* at 73123, 73126. The FRA thus suggested that railroads use "Standardize[d] Test Procedures," "strictly adhere[] to the [testing] procedures [the railroad] established," require a "Qualified Supervisor Conduct[] the Test," and use a "standard form or method to record all relevant information." *Id.* at 73126. The FRA also suggested that railroads "Consider Whether a Vision Condition is Stable or Deteriorating," and more "frequent[ly]" test those with deteriorating conditions. *Id.* at 73127.

Despite this guidance, Union Pacific opted against ensuring that it followed its longstanding field test protocol. It chose instead to create a new "proprietary" test "developed in-house." *DeFries*, 104 F.4th at 1101. The company called its new creation the "Light Cannon" test, after the device that was its centerpiece. But rather than replicate actual conditions in which conductors or locomotive engineers view railway signals while on the job—as the former field test did—this new test required employees to identify the color of a light on an artificially-created device that Union Pacific placed some distance away from the test taker. 3-ER-376; 3-ER-434; *see also*, 2-ER-290–91 ("It isn't a signal that's actually used on the system. It's designed for this test."); 3-ER-379 ("[I]t has no overlap to the signal system whatsoever. It is purely a test of color vision.").

The railroad employed two expert consultants in color vision testing procedures, Dr. Jeffery Rabin and Dr. Douglas Ivan, to perform studies of the Light Cannon test. In 2016, the experts reported to Union Pacific that the Light Cannon test "lacks the necessary scientific and occupational validation" and "remains technologically immature." 3-ER-348. They found that the "device has a number of critical short comings … that will diminish its reliability and effectiveness if it were to be deployed." *Id.* And they "strongly recommended" that the company not "rely on [Light Cannon] testing devices in the field" until "they undergo proper scientific and operational validation studies." *Id.* A "validation process" was necessary, Dr. Ivan explained, to ensure "that color normal[]" employees— employees with normal color vision—"are not being discarded because … the test is not identifying them to be color normal." 2-ER-310.

The railroad went forward anyway without conducting any further validation efforts, choosing to risk screening out qualified employees who could pass a properly vetted test. In April 2016, just three months after Drs. Rabin and Ivan warned that the "Light Cannon" test was unvalidated, Union Pacific eliminated its longstanding secondary color vision field test and began relying on the "Light Cannon" test to determine which conductors it would permit to work and which needed to be sidelined. *DeFries*, 104 F.4th at 1101; 2-ER-235; 2-ER-287–89; 3-ER-323; 3-ER-349. According to the railroad, its Light Cannon test was part of a broader "fitness for

duty" program that the company implemented around the same time. *See Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620 (D. Neb. 2019). Under that program, employees suspected of having certain medical or physical conditions were not only required to undergo further evaluations, but also suspended without pay, and, frequently, restricted altogether from working with the company, even in a different role. *Id.*

It took more than three years after implementing the new color vision test for Union Pacific to finally vet the "Light Cannon" as its experts had recommended. A validation test wasn't performed until 2019, when Union Pacific brought back Dr. Rabin to scientifically evaluate it for the first time. 3-ER-329–34. And that overdue vetting eventually revealed the problem with the company's "act first, ask questions later" approach. In 2020, Dr. Rabin released the results of his scientific evaluation; he found that the test had a 26.5 percent false-fail rate among individuals with normal color vision. 2-ER-219; 3-ER-329–34. As Dr. Rabin explained, that meant the test was not valid. 3-ER-328.

### B. Mr. Donahue's, Mr. Campbell's, and Mr. Goss's experience working for Union Pacific.

In 2003, Union Pacific hired both Jason Campbell and Jacob Goss as railroad conductors; Mr. Goss was also given work as a locomotive engineer. 3-ER-440–42. And in 2006, Union Pacific hired Justin Donahue as a conductor and remote-control operator trainman. 3-ER-438. One of the tasks of these jobs is reading multicolored

railroad traffic signals. 3-ER-438; 3-ER-442. For each of the three plaintiffs' first ten years with the company, Union Pacific followed the FRA's two-step certification process by using the Ishihara test and the secondary color vision field test developed in 1999.

They each took numerous certification exams that included an Ishihara test. *See* 3-ER-438–41; 3-ER-441; 3-ER-443. But as Union Pacific's own expert recognized, the Ishihara test is far from perfect because it tends to produce "false positives" and can "fail … somebody who [has] normal" color vision. 2-ER-301–02. As a result, failing an Ishihara test meant that Union Pacific would administer an alternate test, typically the longstanding field test meant to match their everyday working conditions. 3-ER-374; 3-ER-382; 3-ER-438–41; 3-ER-443. All three employees passed that established field test each time Union Pacific administered it. Throughout this period, Mr. Donahue, Mr. Campbell, and Mr. Goss performed their jobs safely, diligently, and consistently—not once misreading a traffic signal. 2-ER-205–06; 2-ER-210; 2-ER-216; 3-ER-438; 3-ER-441; 3-ER-442.

Starting in 2016, however, after Mr. Donahue, Mr. Campbell, and Mr. Goss each failed an Ishihara test, Union Pacific didn't offer them the field test it had used before. 3-ER-438; 3-ER-441; 3-ER-443. In lieu of its prior field test, Union Pacific required each of them to take the new, proprietary "Light Cannon" test—even though that test wasn't modeled on real-world conditions and did not meet the

18

FRA's validity requirement. 1-ER-23; 2-ER-166; 3-ER-364; 3-ER-401; 3-ER-434; 3-ER-439; 3-ER-441; 3-ER-443. And when the three employees each failed that proprietary test, Union Pacific's Chief Medical Officer labeled each of them with a "color vision deficit" that the company deemed unable to "be accommodated." 2-ER-195; 3-ER-401; 3-ER-439; *see also* 2-ER-197 (Holland stating "Jason Campbell has been disabled from performing his[] regular occupation"); 2-ER-193 (Goss same); 2-ER-199 (Donahue same).

The employees, however, were still interested in working for the company. Mr. Donahue went so far as to arrange Ishihara tests "administered respectively by three separate optometrists in private practice." 1-ER-13. And when he took the three vision tests administered by the optometrists, he passed each. 1-ER-13; *see* 3-ER-351. But Union Pacific nevertheless refused to let Mr. Donahue return to work, "fail[ing] to even engage in an interactive process regarding what accommodations were possible." 2-ER-75–77; 3-ER-446. Instead, it removed all three employees from their jobs and imposed permanent work restrictions. 3-ER-439; 3-ER-441; 3-ER-443.

## III. Procedural history

### A. The *Harris* class litigation.

Mr. Donahue, Mr. Campbell, and Mr. Goss were not alone. In 2016 several employees brought a class-action lawsuit against Union Pacific, alleging that the company's "fitness-for-duty program" discriminated against employees with

disabilities and perceived disabilities in violation of the ADA. *See Harris v. Union Pacific R.R. Co.*, No. 8:16-cv-381 (D. Neb.). Under this program, employees suspected of having certain medical or physical conditions were not only required to undergo further evaluations, but also suspended without pay, and, frequently, restricted altogether from working with the company, even in a different role. *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620 (D. Neb. 2019). The district court eventually certified the class in 2019. *See id.*

Union Pacific's new "Light Cannon" test was one of the tools under the "fitness for duty" program that the railroad used to discriminatorily screen out workers in violation of Section 12112(b)(6) of the ADA. *See* 42 U.S.C. § 12112(b)(6) (prohibiting the use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability"). As the employees explained, because that test was not modeled on real-world conditions, it flunked the FRA's validity requirement. 1-ER-23; 3-ER-433–34; 3-ER-438. And they introduced expert testimony demonstrating why it was so important that railroads follow the FRA's instructions to provide a valid secondary test for those employees who failed the Ishihara test: the Ishihara test sometimes "arbitrarily reject[s] people with normal color vision." *See* Dr. Neitz Expert Report in *Harris v. Union Pacific Railroad Co.* at 7–8, *U.S. Equal Employment Opportunity Commission v. Union Pac. R.R. Co.*, No. 23-3030 (D. Minn. Mar. 31, 2025), ECF No. 93-4.

20

Because this class action was pending at the time Mr. Donahue, Mr. Campbell, and Mr. Goss were fired, they did not file their own lawsuit. In fact, when the *Harris* district court certified the case to proceed as a class action, the court identified Mr. Donahue by name as a representative member of the class. 329 F.R.D. at 624 & n.3. And Mr. Campbell and Mr. Goss appeared on a list of employees that Union Pacific had produced and that the district court identified as the class list. *DeFries*, 104 F.4th at 1102 & n.3.

### B.  Mr. Donahue's, Mr. Campbell's, and Mr. Goss's ADA action.

After the *Harris* class was certified, Union Pacific appealed to the Eighth Circuit, which decertified the class. *See Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020). At that point, Mr. Donahue, Mr. Campbell, and Mr. Goss initiated this action. Like the *Harris* class, they alleged that, although they were qualified to perform their duties, they were removed from employment based on a discriminatory "qualification standard" or "employment test." 3-ER-434–48 (quoting 42 U.S.C. § 12112(b)(6)). They explained that Union Pacific used the Light Cannon test to "screen out" individuals with "disabilities or perceived disabilit[ies]" who could safely perform the essential functions of their jobs in violation of the Americans with Disabilities Act. 3-ER-434; 3-ER-444–45.

***Union Pacific's motion for summary judgment.*** After discovery, Union Pacific moved for summary judgment. It argued both that the claims were

untimely and that they failed on the merits because the employees had not passed the Light Cannon test. *See* 3-ER-402–13.

Initially, the district court only reached the timeliness argument. Ordinarily, the statute of limitations is tolled in an individual action while a class action proceeds. *Am. Pipe & Constr. v. Utah*, 414 U.S. 538, 554 (1974). To avoid that rule, Union Pacific asserted that the class definition had been limited to workers with a "reportable health event," such as a "vision change in one or both eyes affecting color vision." 3-ER-405–04. According to the company, because the plaintiffs "had not experienced" any "vision change," or other "reportable health event," they had never been part of the certified *Harris* class. 2-ER-41–43; 3-ER-405–04. The district court accepted Union Pacific's tolling theory and granted its motion for summary judgment. 1-ER-26–29.

**The first appeal.** Mr. Donahue, Mr. Campbell, and Mr. Goss appealed the district court's tolling decision, and this Court reversed—both in this case and in two consolidated cases involving other Union Pacific employees whose claims were also dismissed as time barred. *Donahue v. Union Pac. R.R. Co.*, 2024 WL 2988223 (9th Cir. June 14, 2024), *cert. denied sub nom. Union Pac. R.R. Co. v. DeFries*, 2025 WL 889139 (U.S. Mar. 24, 2025); *DeFries*, 104 F.4th 1091; *Blankinship v. Union Pac. R.R. Co.*, 2024 WL 2988209 (9th Cir. 2024).

On appeal Union Pacific reiterated its argument below. The company insisted that Mr. Donahue, Mr. Campbell, and Mr. Goss "did not fall within the narrowed class because they did not experience a 'significant vision change' affecting their color vision." Answering Br. at 21, *Donahue v. Union Pac. R.R. Co.* (No. 22-16847), ECF No. 32-1. And it argued that, because they were not included in the class, their claims were now time-barred. *Id.* at 2–3, 33–36.

In reversing the district court, this Court accepted Union Pacific's premise that employees like Mr. Donahue, Mr. Campbell, and Mr. Goss did not have a color vision change. *See DeFries*, 104 F.4th at 1103 & n.3, 1106–09. But it held that, even so, throughout the *Harris* litigation everyone—including "even Union Pacific"— understood that the class definition encompassed color vision plaintiffs like Mr. Donahue, Mr. Campbell, and Mr. Goss. *Id.* at 1108 n.6. Because the three men had not been unambiguously excluded from the class, the statute of limitations for their claims had been tolled. *Id.* at 1105. As a result, this Court reversed the district court's decision and remanded the case for further proceedings. *See Blankinship*, 2024 WL 2988209, at *1.

**Proceedings after remand.** On remand, the district court revisited summary judgment and this time took up Union Pacific's arguments on the merits.

The court first addressed whether Mr. Donahue, Mr. Campbell, and Mr. Goss were "qualified individuals." 1-ER-10–13. Union Pacific argued that the three men

were categorically not "qualified"—that is, unable to perform the essential functions of the job—because they had failed the Light Cannon test. 3-ER-409–11. To support that argument, Union Pacific relied on cases holding that an employer who requires a person to satisfy a federally mandated safety standard has a defense to any resulting ADA claim. *See* 3-ER-409–11 (citing, e.g., *Albertson's, Inc. v. Kirkingburg*, 517 U.S. 555, 570 (1999)).

In response, the plaintiffs argued that failing Union Pacific's novel in-house test did not establish that they were unable to do the job. The FRA does not mandate specific secondary tests; it only provides minimum standards for the test—including that the test must be a "valid" measure of the relevant abilities. 3-ER-364; *see* 49 C.F.R. Pt. 242, App'x D. Yet the Light Cannon test—with its 26.5 percent error rate—was anything but. 3-ER-365. And the evidence otherwise demonstrated that the three men were "qualified individuals" who could perform the essential functions of their jobs. 3-ER-360; 3-ER-362. They had all repeatedly passed Union Pacific's original color vision field test, which used actual wayside signals to test examinees' ability to do the job, with perfect scores. 3-ER-362. And nothing changed after that: they continued to "perform [their] job[s] for years without incident and without ever missing a signal." *Id.* Mr. Donahue even had additional testing done at his own expense, further corroborating that nothing had changed. 1-ER-13; *see* 3-ER-351. So

all Union Pacific's flawed in-house test showed was that the company regarded them as disabled, not that they couldn't do the job.

The district court agreed with the workers and rejected Union Pacific's argument about its Light Cannon test. 1-ER-12. Reviewing "the record as a whole," the court found "sufficient evidence to raise a genuine issue as to the validity of the Light Cannon [test]." *Id.* And an invalid test is not an "approved … field test" "pursuant to FRA guidance and regulations." 1-ER-11. Union Pacific therefore had not established that failing its own flawed and allegedly discriminatory test meant that someone was actually unqualified to do the job.

Nevertheless, it remained the workers' burden to adduce evidence from which a fact-finder could infer that they were able to perform the essential functions of their jobs. And the district court held that Mr. Goss's and Mr. Campbell's long and unblemished records of doing the job effectively and passing a prior, non-discriminatory version of the field test were not enough. 1-ER-12. The court determined that the plaintiffs were instead required to provide "more than past performance and past testing" to show that they remained able to see as well as the FRA requires "at the time [they] w[ere] removed from service." 1-ER-12–13.

The court found that Mr. Donahue, on the other hand, had unquestionably carried his burden to show that he was a "qualified individual." That's because, after the company-provided tests failed to confirm his abilities, he went the extra mile: He

"passed Ishihara tests administered respectively by three separate optometrists in private practice[s]." 1-ER-13. The court held that "raised a triable issue as to qualification" because it indicated he could have passed a valid, properly administered field test if the company had provided one. *Id.*

Despite holding that Mr. Donahue was qualified, however, the court granted summary judgment to Union Pacific. In the court's view, Mr. Donahue had failed to provide sufficient evidence of discrimination because he did not show that he "was removed from service on the basis of a perceived disability." *Id.*

Mr. Donahue had argued that Union Pacific's statement that it removed him because of a "color vision deficit" was evidence of "facial discrimination," and that no more evidence of discrimination was needed. 3-ER-358–61. After all, the plain text of the ADA says that using "using qualification standards, employment tests, or other selection criteria … to screen out" qualified individuals based on an "actual or perceived" disability is actionable discrimination, absent a valid affirmative defense. 3-ER-365–64 (quoting 42 U.S.C. § 12112(b)(6), 42 U.S.C. § 12102(3)(a)). And, as this Court made clear in *Bates*, when an employee has evidence of an employer's ability-based screening test that is "facially discriminatory," they do not need to show that the employer's reason for the discrimination was pretextual. 511 F.3d at 988; 3-ER-353–57; 3-ER-362. Rather, a standard that screens for disability constitutes a

"*per se* violation of the ADA" unless the employer has a valid affirmative defense. *Bates*, 511 F.3d at 988.

The district court ignored this settled law. It did not acknowledge that the facts identified by Mr. Donahue could constitute discrimination on their face, and it did not consider the text of § 12112(b)(6). Instead, it sidestepped Mr. Donahue's evidence by adopting a different requirement found nowhere in the statute. In the court's view, to survive summary judgment an employee must—regardless of whether there is evidence of facial discrimination—introduce evidence that "directly reflect[s] a discriminatory animus" on behalf of the employer. 1-ER-15. And, evidence of animus aside, the district court also rejected Mr. Donahue's argument under *Bates* that evidence of facial discrimination carries a plaintiff's burden to show that their employer discriminated under the ADA. The court instead concluded that Mr. Donahue was required to show that Union Pacific's asserted reason for firing him—failing the Light Canon test—was pretextual in order to prove discrimination. 1-ER-15–16. After determining that he had not made that showing, the court held that his claim failed for that second reason as well.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). The Court "view[s] the evidence in the light most favorable to the nonmoving party" and determines

"whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

"The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31 (1986). "Where the moving party … seeks summary judgment on the ground that the nonmoving party—who will bear the burden of persuasion at trial—has no evidence … the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party." *Id.*

## SUMMARY OF ARGUMENT

**I.** The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The district court correctly held that Mr. Donahue was "otherwise qualified" because he demonstrated that he could "perform the essential functions of the job." *Id.* § 12111(8). But the district court improperly granted summary judgment against Mr. Donahue for not sufficiently showing that he was discriminated against on the basis of disability. The court erred in failing to follow this Court's established framework for resolving claims based on facially discriminatory screening tests under 42 U.S.C. § 12112(b)(6), as articulated in *Bates*, 511 F.3d at 988–89.

**A.** Under section 12112(b)(6) of the ADA, "qualification standards, employment tests or other selection criteria that screen out" individuals with disabilities constitute

prohibited discrimination, "*unless*" the standard or test "is shown to be job-related for the position in question and is consistent with business necessity." (emphasis added). As this Court explained in *Bates*, that means that employers are prohibited from applying a "facially discriminatory qualification standard"—meaning a selection criteria that "focuses directly on an individual's disabling or potentially disabling condition," unless the employer has a valid defense. 511 F.3d at 988. In other words, when employers fire individuals for failing a standard that is screening for a perceived disability, the reason for the adverse action is discriminatory on its face— and "whether the employer made an employment decision on a proscribed basis … is not in dispute." *Id.* An employee has therefore carried their burden under the ADA to show they were "discriminate[d] against … on the basis of disability," 42 U.S.C. § 12112(a), if they can show they were "screened out" of their job based on a "*facially discriminatory* qualification standard." *Bates*, 511 F.3d at 988.

Mr. Donahue carried his burden under *Bates*. Union Pacific stated that it terminated Mr. Donahue because he failed a "color-vision test[]"—the Light Cannon test—and that it therefore perceived him as having a "color vision deficit." 2-ER-199; 3-ER-359–60; 3-ER-362–65. That was facially discriminatory. Union Pacific therefore "violate[d] the ADA *unless* [the employer] can prove a valid defense." *Bates*, 511 F.3d at 994.

29

**B.** While ignoring *Bates*, the district court's analysis relied on two different legal errors. First, the district court went wrong by demanding that Mr. Donahue produce evidence that Union Pacific was motivated by discriminatory animus. 1-ER-15. The ADA imposes no such requirement: nothing in the text of the statute "speaks in terms of … animus." *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 436 (6th Cir. 2018). That includes the provision that Mr. Donahue relies on, section 12112(b)(6), which only requires a plaintiff to show that their employer imposed a standard or test that "screen[ed] out" disabled individuals—not that the employer had any particular motive for doing so. Accordingly, this Court's cases involving comparable ADA claims never once mention any requirement to show "animus" like the one the district court imposed. *See Bates*, 511 F.3d at 990–98; *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999); *BNSF Ry. Co.*, 902 F.3d at 927. The district court justified this novel requirement by citing a few out-of-circuit district court cases, but those authorities are unpersuasive, and certainly cannot justify its departure from controlling precedent and the ADA's text.

The district court's second error was in holding that Mr. Donahue had a burden to prove that the reason Union Pacific gave for his firing was pretextual. 1-ER-14–16. This Court has made clear that a pretext "inquiry or burden-shifting protocol" does not apply to claims of facial discrimination. *BNSF Ry. Co.*, 902 F.3d at 927 (describing the holding of *Bates*). The district court nevertheless went awry by

relying on *Opara v. Yellen*, 57 F.4th 709 (9th Cir. 2023), a case about an employer's facially *neutral* termination decision. *See* 1-ER-16–17. *Opara* is irrelevant because it did not involve—and therefore does not govern—claims that challenge a facially *discriminatory* employment decision. Instead, it is *Bates* that establishes the controlling legal framework here. 511 F.3d at 982.

**II.** The district court also erred in holding that Mr. Campbell and Mr. Goss failed to demonstrate a genuine dispute of fact about whether they are "qualified individuals." 1-ER-10–13.

To be a qualified to do the work of a conductor, an employee must be able to read color-coded traffic signals accurately and be able to obtain a color vision certification. Mr. Campbell and Mr. Goss can do that. There is no dispute that both had been successfully performing their work for years without incident, that both had passed a prior color vision field test with perfect scores, and—as Union Pacific has repeatedly asserted—that neither of their color vision had changed since the last time they were tested. *See* 1-ER-44–46; 3-ER-405–04. That is more than enough evidence to permit a factfinder to infer that they would have passed a valid field test again if only Union Pacific had offered one.

The district court correctly concluded that failure of Union Pacific's invalid Light Cannon field test did not mean that Mr. Campbell and Mr. Goss could not see

well enough to do their jobs, as the FRA requires. All Union Pacific's flawed test shows is that the company regarded Mr. Campbell and Mr. Goss as disabled.

But the district court went wrong in holding that their long track record of doing the job successfully combined with their ability to repeatedly pass field tests in the past was insufficient to show that they are qualified. 1-ER-13. Union Pacific has asserted throughout earlier stages of this litigation that Mr. Campbell's and Mr. Goss's vision did not change after they had satisfied Union Pacific's color vision prior field test. *See* 1-ER-28–29; 3-ER-405–04. That should have been sufficient for summary judgment purposes to show that they could still see color well enough to do the job when they were later forced to take, and fail, the flawed "Light Cannon" test. Nevertheless, the district court declined to give "weight" to their long track records of passing Union Pacific's previous color vision test based on a line from an NTSB report that criticized that test. But it is the FRA, not the NTSB, that determines whether a field test complies with the FRA's regulations. 49 C.F.R. §§ 242.117; 242.103. And the FRA notably never adopted the NTSB's criticism. The district court's choice to give controlling weight to the NTSB report at summary judgment is therefore reversable error. *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1110 (9th Cir. 1999) (courts may "not weigh evidence on a summary judgment motion").

## ARGUMENT

The district court held that Mr. Donahue failed to show he was discriminated against because he did not have direct evidence of animus and because he failed to establish that the company's asserted reason for the firing was pretextual. But under the ADA, as with other antidiscrimination laws, when a plaintiff provides evidence of *facial* discrimination, no evidence of animus or pretext is necessary to defeat an employer's motion for summary judgment. *See Bates*, 511 F.3d at 988. And here, the undisputed evidence shows that Union Pacific fired Mr. Donahue—as well as Mr. Campbell and Mr. Goss—for a facially discriminatory reason: The railroad determined that each of them had a "color vision deficit." Unless Union Pacific can show beyond dispute that they are unqualified for the position, or that it is entitled to prevail on an affirmative defense like "business necessity," the employees' claims should have proceeded to trial. *See Bates*, 511 F.3d at 990–998.

Correcting that error is sufficient to reverse the grant of summary judgment against Mr. Donahue. But as to Mr. Campbell and Mr. Goss, the district court committed an additional error: It held that they lacked sufficient evidence to show they were "qualified individuals." *See* 1-ER-9. Both men, however, demonstrated that they were qualified based on their flawless record of performing their job, because they satisfied the FRA certification standards numerous times previously in the years they worked for the company, and because Union Pacific has stated that their color

vision did not change after they passed those prior tests. Under a proper application of the ADA and the summary judgment standard, nothing more is required.

## I.   The district court erred in granting summary judgment against Mr. Donahue.

The ADA bars discrimination "against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), including discrimination against individuals "regarded as having" a disability. *Id.* § 12102(1)(C). The district court correctly found that Mr. Donahue was "qualified" to serve as a railroad conductor. 1-ER-13. Given this, Mr. Donahue carries his burden under the ADA so long as he can establish that he was "discriminate[d] against … on the basis of disability," whether "actual or perceived." 42 U.S.C. §§ 12112(a), 12102(3)(A).

Mr. Donahue did just that. In the district court, Mr. Donahue showed that Union Pacific used its Light Cannon test to deem him disabled and terminated him on that basis. 3-ER-358–60; 3-ER-362–65. That is undisputed. Union Pacific was explicit that its termination of Mr. Donahue was based on a "color vision deficit." 2-ER-199.

That decision, made expressly because of a perceived disability, was facially discriminatory under this Court's en banc decision in *Bates*, 511 F.3d at 994. *Bates* makes clear that when a qualified individual is subjected to a test that screens for an actual or perceived disability, that is facial discrimination under § 12112(b)(6), and his employer has therefore "violate[d] the ADA *unless* [the employer] can prove a valid

34

defense." *Id.* As a result, the only question that should have been left for the district court to consider was whether Union Pacific was entitled to summary judgment on its "business necessity" affirmative defense. *Id.*

But the district court ignored Mr. Donahue's argument that Union Pacific's vision test was discriminatory on its face, and that therefore nothing more was required to meet his burden. Instead, the court demanded that Mr. Donahue produce evidence of discriminatory animus—an atextual burden not found in the ADA. 1-ER-15. It then tasked him with proving that Union Pacific's stated reason for his termination was pretextual—a burden-shifting framework that is inapplicable to facial discrimination claims. *See BNSF Ry. Co.*, 902 F.3d at 927 (citing *Bates*, 511 F.3d at 988). Because the district court applied the wrong legal standards to this case of facial discrimination, and erroneously granted summary judgment on that basis, this Court should reverse.

### A. Because Union Pacific's test facially discriminates based on perceived disability, it is a *per se* ADA violation unless the railroad can prove its business necessity affirmative defense.

**1.** Congress has made explicit that "qualification standards, employment tests or other selection criteria that screen out" individuals with disabilities necessarily constitute prohibited discrimination, "*unless*" the standard or test "is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6) (emphasis added). Through section 12112(b)(6), the ADA therefore

prohibits an employer from applying a "facially discriminatory qualification standard"—meaning a selection criteria that "focuses directly on an individual's disabling or potentially disabling condition"—unless the employer can show that the facially discriminatory standard is a "business necessity." *Bates*, 511 at 982; *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (explaining that policies that "depend[] upon" a protected trait are facially discriminatory). Mr. Donahue's claim that Union Pacific fired him because he did not pass the Light Cannon test fits that definition to a T: The Light Cannon test focused directly on a potentially disabling condition—here, a perceived color vision disability—and screened Mr. Donahue out of his employment on that basis. 2-ER-199–201.

In *Bates*, this Court explained that (absent a valid defense, and when applied to a qualified individual) such facially discriminatory employment tests violate section 12112(b)(6). There, a class of truck drivers challenged UPS's mandatory hearing test for certain categories of truck drivers as a violation of 42 U.S.C. § 12112 (b)(6). 511 F.3d at 981. Like the Light Cannon test, the hearing standard was of UPS's own choosing—it was not "federally mandated." *Id.* The class contended that the hearing test was used to screen them out of employment with UPS based on an actual or perceived disability, which it made it facially discriminatory. *Id.* This Court agreed with them and held that, because the hearing test "focuse[d] directly on an individual's disabling or potentially disabling condition," it was discriminatory on its

36

face. *Id.* at 988. And because UPS's reason was discriminatory on its face, "whether the employer made an employment decision on a proscribed basis … is not in dispute." *Id.* As a result, nothing more was needed for the drivers to carry their burden to show discrimination. *See id.*

*Bates* thus establishes the controlling framework for how to resolve ADA claims that allege a company used facially discriminatory tests and standards to screen out employees based on disability in violation of section 12112(b)(6). *See* 3-ER-434–48. First, an employee must show that they are an "otherwise qualified person[]," meaning that, despite not satisfying the employer's challenged employment standard, they "can perform the 'essential functions' of the job." *Bates*, at 982, 990 (quoting 42 U.S.C. § 12111(8)). An employee then carries their burden to show they were "discriminate[d] against … on the basis of disability," 42 U.S.C. § 12112(a), if they can show they were "screened out" of their job based on a "*facially discriminatory* qualification standard." *Bates*, 511 F.3d at 988. And such discrimination is illegal under section 12112(b)(6) unless the employer can then prove "that the challenged standard is job-related and consistent with business necessity." *Rohr v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009). It is therefore the law of this circuit that, when "it is clear that an action was taken because of an impairment or perception of an impairment, no further inquiry or burden-shifting protocol is necessary" to

determine whether the alleged disparate treatment was discriminatory. *BNSF Ry. Co.*, 902 F.3d at 927.

*Bates*'s framework is not unique. Courts across the country recognize that when an employer states that an individual's disability is the reason for the employer's action, the employer has "in effect admitted" to discrimination. *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 132 (3d Cir. 1996). Such "proof of a facially discriminatory employment policy" "does not require the fact finder to draw any inferences to reach th[e] conclusion" that the employer discriminated. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006).[4]

Of course, this approach stands in contrast to what's required when a plaintiff challenges a facially *neutral* employment decision. In that context, courts often proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, first a plaintiff alleges that an employer undertook a facially permitted employment action with an impermissible motive. The burden then shifts to the employer to identify a "legitimate, nondiscriminatory reason" for their action. *Lui v. DeJoy*, 129 F.4th 770, 776 (9th Cir. 2025). If the employer satisfies that burden, the plaintiff must then prove "that the

---

[4] Other circuits agree. *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1204 (10th Cir. 2007); *Reidt v. Cnty. of Trempealeau*, 975 F.2d 1336, 1340–41 (7th Cir. 1992); *Rizzo v. Child.'s World Learning Ctrs., Inc.*, 84 F.3d 758, 762 (5th Cir. 1996).

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

But that burden-shifting framework only applies where a claim turns on whether an employer's "neutral employment and personnel decisions" were made because of discrimination based on a protected characteristic. *McDonnell Douglas*, 411 U.S. at 801. It is not applicable when an employer's decision "is discriminatory on its face." *Am. Ass'n of Retired Persons v. Farmers Grp., Inc.*, 943 F.2d 996, 1000 n.7 (9th Cir. 1991). *Bates* therefore recognized that this kind of burden-shifting has no place in the analysis of a claim that an employer used a facially discriminatory employment test to screen out employees in violation of section 12112(b)(6). *BNSF Ry. Co.*, 902 F.3d at 927; *see Bates*, 511 F.3d at 988 (holding that "[a] burden-shifting protocol is … unnecessary in this circumstance").

**2.** Mr. Donahue showed that Union Pacific fired him based on a facially discriminatory vision test. Under *Bates*, that test is therefore illegal unless Union Pacific can substantiate a valid defense.

Start with the challenged test. There is no dispute that Union Pacific screens out conductors by requiring them to undergo the Light Cannon test—a "test of color vision" designed to determine whether employees have a vision deficit. *See* 3-ER-378. Just like the hearing standard UPS imposed in *Bates*, Union Pacific's test is "facially

39

discriminatory" because it "focuses directly on an individual's disabling or potentially disabling condition." *Bates*, 511 F.3d at 988.

And, like Mr. Bates, Mr. Donahue lost his job because of that "facially discriminatory qualification standard." *See id.* Because Mr. Donahue failed the Light Cannon test, Union Pacific "certif[ied] that Justin Donahue has been disabled ... due to the following condition(s): color vision deficit," and "permanent[ly] restrict[ed]" him from employment with the company on that basis. 2-ER-199; 2-ER-201. In other words, the railroad relied on Mr. Donahue's failure of its test to determine that Mr. Donahue had an "actual or perceived physical ... impairment"—a color vision deficit—and it "screen[ed] [him] out" on that basis. 42 U.S.C. §§ 12102(3)(A), 12112(b)(6). As *Bates* makes clear, that is enough to show that Mr. Donahue was "discriminate[d] against ... on the basis of disability" under the ADA. 42 U.S.C. § 12112(a); *see Bates*, 511 F.3d at 988. No additional burden-shifting was needed. *Id.* The only remaining question to determine whether Union Pacific violated the ADA should have been whether Union Pacific can satisfy the business necessity defense. But it is up to Union Pacific to make that case. *See Rohr*, 555 F.3d at 862; *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

### B. The district court erred by requiring evidence of animus to prove discrimination and by applying a burden-shifting framework to a facial discrimination case.

The court below did not conduct the correct analysis under the ADA. Instead, the district court first introduced an atextual requirement that employees must show that employers acted with animus to prove discrimination. The court then compounded that error by ignoring *Bates*'s instruction about how to resolve an ADA claim challenging a facially discriminatory policy like this one. Instead, the court applied a generic burden-shifting framework intended for challenges to facially neutral employment actions—an analytical approach that this Court's en banc decision in *Bates* expressly forecloses. The district court never even mentioned *Bates*.

### 1. The district court erred in requiring Mr. Donahue to show animus to prove discrimination under the ADA.

In the district court's view, Mr. Donahue could only prevail if his evidence could "be viewed as directly reflecting a discriminatory animus." *See* 1-ER-15. But the ADA imposes no such requirement.

The statute "speaks in terms of causation, not animus" in prohibiting employers' actions resulting from "discriminat[ion] on the basis of disability." *Dolgencorp*, 899 F.3d at 436. "The ADA['s] passage was premised on Congress's finding that discrimination against the disabled is "most often the product, not of invidious animus, but … of apathetic attitudes rather than affirmative animus." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944–45 (9th Cir. 2011). Its text explicitly

defines "discriminat[ion] … on the basis of disability," whether actual or perceived, without any reference to animus of any sort. 42 U.S.C. §§ 12112(a)–(b); 12102(1), (3)(A). At most, some examples of covered actions speak in terms of actions taken "because of" disability. *See, e.g.*, *id.* § 12112(b)(4). But the provision that Mr. Donahue relies on looks only to whether the employer imposed a standard or test that "screen[ed] out" disabled individuals, not the employer's motive for adopting that standard. *Id.* § 12112(b)(6); *see Bates*, 511 F.3d at 994. While evidence of an employer's animosity toward disabled people might sometimes be sufficient, it is certainly not "a *necessary* requirement for liability." *Dolgencorp*, 899 F.3d at 436 (emphasis added).

In an ADA case, it is therefore "of no moment that [an employer] harbors no ill-will towards" disabled people. *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 480 (5th Cir. 2006). Accordingly, this Court's cases involving comparable ADA claims never once mention any requirement to show "animus" like the requirement the district court imposed. *See Bates*, 511 F.3d at 990–98; *McGregor*, 187 F.3d at 1116; *BNSF Ry. Co.*, 902 F.3d at 927.

That conclusion aligns with how courts generally interpret antidiscrimination statutes. The ordinary meaning of "discrimination" is "differential treatment." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020). And, time and again, the Supreme Court has explained that "the word 'discriminate'" does not "impose[] an additional requirement that the [] plaintiff prove the employer's … animus." *Murray v. UBS Sec.*,

*LLC*, 601 U.S. 23, 35 (2024); *see also, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 663–64 (2020) (absence of animosity is "irrelevant" to Title VII discrimination claim). That's why a "facially discriminatory policy" constitutes discrimination, even "absen[t] … a malevolent motive." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

To justify its departure from this settled and controlling approach, the district court relied on three out-of-circuit unpublished district court cases. *See* 1-ER-15 (citing *Carrillo v. Union Pac. R.R. Co.*, 2022 WL 3224000, at *5 (W.D. Tex. Aug. 9, 2022); *Jackson v. Union Pac. R.R. Co.*, 2021 WL 1726895, at *14–15 (S.D. Iowa Mar. 29, 2021); *Bohner v. Union Pac. R.R. Co.*, 2021 WL 3363063, at *4 (E.D. Mo. Aug. 3, 2021)). But unlike the district court here, none of those courts were bound to apply the binding framework this Court set out in *Bates* and none meaningfully grappled with the text of the ADA. *See, e.g.*, *Bohner*, 2021 WL 3363063, at *4–6 (briefly asserting discrimination requires animus without identifying where the requirement is found in the statute, and not providing further analysis because the plaintiff did not "argu[e] the issue").

## 2. The district court erred by requiring Mr. Donahue to show that Union Pacific's reason was pretextual.

The court committed its second error by employing an inapplicable burden-shifting framework, rather than the controlling standard for claims of facial discrimination under section 12112(b)(6) that this Court established in *Bates*. The district court held that, because Union Pacific responded with a "legitimate,

43

nondiscriminatory reason for" Mr. Donahue's termination, it was Mr. Donahue's burden to prove that that reason was pretext. 1-ER-14–16. That was wrong. The burden-shifting pretext framework only applies when an employer's stated reason for an employment decision is facially neutral. But "where it is clear that an action was taken because of an impairment or perception of an impairment"—as it is here—"no further inquiry or burden-shifting protocol is necessary." *BNSF Ry. Co.*, 902 F.3d at 927 (describing the holding of *Bates*); *see supra* Part I.A.1. The district court's failure to adhere to the controlling rule for facial discrimination that violates section 12112(b)(6) of the ADA is reversable error. *See id.*; *Bates*, 511 F.3d at 982.

What led the district court astray? It relied on a recent decision from this Court describing the standard that applies when considering an employer's facially *neutral* termination decision under general prohibitions of employment discrimination. *See* 1-ER-16–17 (applying *Opara*, 57 F.4th 709). But here again, where there is *facially discriminatory* evidence of an employer's adverse action, it is *Bates*—which articulates the controlling framework for analyzing claims "involv[ing] … facially discriminatory" evidence under section 12112(b)(6) of the ADA—that controls. *Bates*, 511 F.3d at 982.

*Opara*, in contrast, is inapplicable here, because it did not involve—and therefore says nothing about—facial discrimination. The plaintiff in *Opara*, an IRS employee, was fired for improperly accessing taxpayer data. She challenged that

decision on the grounds that her firing was actually motivated by age and national origin discrimination. 57 F.4th at 720. But she did not allege that any actions her employer took against her were facially discriminatory. She couldn't: The documented basis for her firing was that she "improperly accessed taxpayer data." *Id.* at 718. Her primary evidence of discrimination was a stray comment from one of the several decisionmakers involved in her firing, made seven years before in a different context, that "if anyone is too old to do this job, she should quit" and "the job was better with young people." *Id.* at 719, 725. Because that was at least some evidence of secret discriminatory motive, this Court applied a burden-shifting pretext inquiry to determine whether the employer's facially neutral reason for firing her—unrelated to any protected trait—was pretext for unlawful discrimination. *Id.* at 723, 725. The Court held that the reason was not pretextual, and affirmed summary judgment to the IRS. *Id.* at 728–29.

That *Opara* does not reference facial discrimination makes sense. As *Bates* squarely held, the burden-shifting approach used in cases like *Opara* has no application to claims of facial discrimination brought under section 12112(b)(6). *See BNSF Ry. Co.*, 902 F.3d at 927; *Bates*, 511 F.3d at 988. As explained above, in cases involving facial discrimination, an employer has *already* "admitted" that its decision was based on a protected characteristic—which is the very thing the plaintiff seeks to prove. *Healey*, 78 F.3d at 131–32. Where an employer "admits to taking account of

45

disability status" in taking an adverse action, the question that a pretext inquiry is designed to address—"whether the employer made an employment decision on a proscribed basis"—cannot meaningfully be disputed. *Bates*, 511 F.3d at 988; *see Piercy*, 480 F.3d at 1204. The crux of the dispute is not whether the employer's action was discriminatory, but rather "whether that discrimination was justified." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 352 (5th Cir. 2019) (Costa, J., concurring). The pretext inquiry the district court applied therefore has no place in this case.

That said, even if the district court were right to adopt a burden-shifting framework to determine if the railroad's decision was pretextual, it still erred in holding that the railroad met its burden at step 2. Under the ADA, a "non-discriminatory reason" must "disclaim[] any reliance on" and "have nothing to do" with the employee's disability. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). When an employer's stated justification is merely "direct evidence of discrimination based on … disabilities," it cannot be "non-discriminatory." *Villalobos v. TWC Admin. LLC*, 720 F. App'x 839, 845 (9th Cir. 2017). Either way, Union Pacific didn't meet its burden in moving for summary judgment, and the district court erred in holding otherwise.

## II.    Mr. Campbell and Mr. Goss raised a genuine dispute of material fact about whether they are "qualified individuals."

The district court granted summary judgment on Mr. Campbell's and Mr. Goss's claims for an additional reason that does not apply to Mr. Donahue's claim:

46

It held that they failed to demonstrate a genuine dispute of fact about whether they were "qualified individuals." 1-ER-10–11. That, too, was error. There is no dispute that both workers had been successfully performing their work for years without incident, that both had passed a prior color vision field test with perfect scores on at least four different occasions over many years, and that neither of their color vision changed since the last time they were tested. That is more than enough to permit a factfinder to conclude that they remained able to distinguish colors well enough to do their jobs, and that they would have passed a valid field test if only Union Pacific had offered one. They therefore adduced evidence sufficient to conclude that they were qualified to perform the essential functions of their jobs.

**1.** As previously explained, the ADA prohibits covered entities from discriminating "against a qualified individual on the basis of disability in regard to" their employment. 42 U.S.C. § 12112(a); *see id.* § 12102(1)(A)–(C) (defining "the term 'disability,' with respect to an individual" under the ADA as having a disability or "being regarded as having such an impairment"). And a qualified individual is one who can "perform the essential functions" of the job. 42 U.S.C. § 12111(8).

There is no dispute about what is required to perform the essential functions of the conductor position here, at least for purposes of this appeal. An employee must be able to read color-coded traffic signals accurately, 1-ER-10–11, and must also be

able to obtain a color vision certification. 49 C.F.R. § 242.117 (permitting railroads to use only conductors who have sufficient color vision to merit certification).[5]

Failing Union Pacific's proprietary Light Cannon test does not answer either question. Because the unvetted Light Cannon test has since been shown to be invalid, with a high rate of failing individuals with normal color vision, failing to pass it does not mean an employee cannot read colored traffic signals accurately. 2-ER-219; 3-ER-329–34. And for similar reasons, failing the Light Cannon test also does not mean that a worker could not obtain an FRA-complaint color vision certification. The FRA permits conductors to obtain certification in two ways. *See supra* at 10. First, they may pass a designated primary test, like the Ishihara test. Second, failing that, they may pass "a field test" that is "performed outdoors under test conditions that reasonably match actual operating  or working conditions" and that is "valid, reliable, and comparable." 49 C.F.R. Pt. 242, App'x D(4); FRA  Best Practices, 80 Fed. Reg. at 73124; 49 C.F.R. § 242.117(e). As with Mr. Donahue, Mr. Campbell and Mr. Goss were fired when they failed the secondary Light Cannon field test. But, as Union Pacific's own experts found, that test did not provide a scientifically valid assessment of whether they had adequate color vision. 2-ER-219; 3-ER-329–34;

---

[5] It is unclear whether meeting a government-imposed requirement is properly considered an essential function of the job that the plaintiff must prove, or part of an affirmative defense that the defendant must raise. *See Albertson's*, 527 U.S. at 578 (Thomas, J., Concurring). For present purposes, the distinction is immaterial.

3-ER-348. That they failed the Light Cannon test did not mean that they would not have passed a valid field test and obtained certification, if only Union Pacific had offered them one.

**2.** Mr. Campbell and Mr. Goss submitted sufficient evidence for a factfinder to conclude that they could perform their jobs' essential functions, and, had they been offered a valid field test, that they would have passed and been certified.

To begin, all agree that Mr. Campbell and Mr. Goss had been successfully doing their jobs for years. Before Union Pacific removed them, Mr. Campbell and Mr. Goss had been in their positions for 15 and 14 years, respectively. 3-ER-441–444. It is undisputed that Mr. Campell and Mr. Goss had a perfect track record throughout that entire period, never "miss[ing] a train signal." *See* 2-ER-205–04; 2-ER-211; 2-ER-216. Union Pacific does not contest this. That is significant because it supports an inference that right up until Union Pacific used its flawed test to bar them from work, Mr. Campbell and Mr. Goss correctly identified every traffic signal under *actual* operating conditions—not merely those that "reasonably match" the conditions (as called for by the FRA). FRA Best Practices, 80 Fed. Reg. at 73124.

Moreover, both Mr. Campbell and Mr. Goss had repeatedly and consistently passed Union Pacific's prior field test. 3-ER-351–52; 3-ER-371; 3-ER-373. Union Pacific told federal officials that that "test has been in use since 1999 and complies with" the FRA regulations that set out the certification requirements for "color

vision." NTSB Report at 22 (statement quoted in 2012 report). That's important because Mr. Campbell passed that previous, valid version of the field test on no fewer than *six* occasions, most recently in 2015. 3-ER-346–47; 3-ER-371–72; 3-ER-441. And Mr. Goss similarly passed it *four* different times between 2005 and 2016. 3-ER-424; 3-ER-443. A factfinder would know that Mr. Campbell and Mr. Goss had passed every valid field test that was ever administered to them, consistently over many years. They would also know that the only field test either employee *ever* failed was the demonstrably flawed "Light Cannon" test. *See* 2-ER-219 (2020 report from Union Pacific's expert consultant determining that the Light Cannon test has a 26.5 percent false-fail rate among individuals with normal color vision).

Taking those facts in the light most favorable to Mr. Campbell and Mr. Goss, it is reasonable to infer that the novel, unvetted, and invalid "Light Cannon" test was the cause of the newly anomalous result, not any actual problem with their vision. *See Mills v. Union Pac. R.R. Co.*, 2024 WL 185246, at *10 (D. Idaho Jan. 16, 2024) (denying summary judgment on a similar claim where the plaintiff had "a lengthy employment history of passing color-vision field tests and correctly identifying railroad signals").

And on top of that, as Union Pacific itself told the district court, Mr. Campbell's and Mr. Goss's vision has not changed since they passed the company's

original color vision field test with perfect scores.[6] Union Pacific insisted that "Campbell and Goss" were "employees who had not experienced a reportable health event"—which the company explicitly defined as including "vision change." 2-ER-41–43; 3-ER-405. The company also insisted there was no relevant factual dispute over this issue, asserting that the plaintiffs' argument failed specifically because they "do not claim they" had a "reportable health event." 3-ER-405–06. And Union Pacific made the same assertions in this Court. In its first appeal, Union Pacific maintained that Mr. Campbell and Mr. Goss were not members of the narrowed *Harris* class precisely because they "did not experience a 'significant vision change' affecting their color vision." Answering Br. at 21, *Donahue v. Union Pac. R.R. Co.* (No. 22-16847), ECF No. 32-1; *see* De*Fries*, 104 F.4th at 1103 (describing Union Pacific's arguments).

These were not throwaway remarks. The company was insistent on this point because Mr. Campbell's and Mr. Goss's lack of any color vision change formed the basis for its tolling argument. 3-ER-405–06. Union Pacific argued that the plaintiffs had never been part of the certified *Harris* class because they lacked a vision change:

---

[6] Union Pacific's admissions on this point are consistent with Mr. Campbell's and Mr. Goss's own assertions. Mr. Campbell and Mr. Goss confirmed that, since they were first hired and began "perform[ing] [their] job for years without incident and without ever missing a signal," they "had the physical capacity to perform the functions of th[eir] positions." 3-ER-352; 3-ER-362. That never changed; they continued to be "able to perform the functions of their jobs" when they were fired. *Id.*

51

"to fall within the narrowed class definition stated in the Harris certification motion, putative class members were required to have experienced a 'reportable health event,'" which the company defined as including a "significant vision change in one or both eyes affecting color vision." 3-ER-405–06. And Union Pacific won its first motion for summary judgment based on this very argument. 1-ER-28–29 (district court adopting Union Pacific's argument); *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("For purposes of summary judgment, the courts have treated representations of counsel in a brief as admissions even though not contained in a pleading or affidavit.").

That Mr. Campbell's and Mr. Goss's vision never changed since they had passed numerous valid field tests indicates that they could have again passed a valid field test when they were fired. Absent "proof of change," a prior finding that a party has "been determined not to be disabled" "gives rise to a presumption that th[at] condition continues to exist." *Lyle*, 700 F.2d at 568; *accord Giddings v. Greyhound Lines Inc.*, 609 F. App'x 457 (9th Cir. 2015) (holding that a "genuine dispute of material fact" exists regarding a plaintiff's current medical condition where the "record shows" (1) his past condition and (2) evidence "giving rise to an inference" that the past condition had not changed). It follows that the only reason that Mr. Campbell and Mr. Goss were not certified through a valid field test was that Union Pacific didn't give them one—it subjected them to the faulty Light Cannon test that erroneously

screened out capable conductors instead of a valid field test that would have met the FRA's requirements.

**3.** The district court recognized that if Mr. Campbell and Mr. Goss had submitted evidence that they could pass a color vision acuity test other than the Light Cannon test, then summary judgment would be improper. *See* 1-ER-13 (finding Mr. Donahue had done so). But it held that their ability to satisfy a field test in the past was, on its own, insufficient because the FRA requires recertification every three years. *Id.* That reasoning ignored Union Pacific's repeated concessions that Mr. Campbell's and Mr. Goss's vision had not changed since they had satisfied Union Pacific's color vision field test in the past. *Cf. Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 745 (9th Cir. 2010) (On "summary judgment" courts must accept "undisputed fact[] as true.").

The district court also chose not to give "weight" to Union Pacific's original color vision test based on a line in the NTSB report stating that the test didn't "ensure that Union Pacific Railroad employees have adequate color perception." 1-ER-12 (quoting NTSB Report at 42). But Union Pacific had previously maintained that that test "complie[d] with" FRA regulations. NTSB Report at 22. Regardless, it is the FRA, not the NTSB, that determines whether a field test complies with the FRA's regulations. 49 C.F.R. §§ 242.117; 242.103. And the FRA notably never adopted the NTSB's finding about Union Pacific's existing color vision test. To the contrary, it

questioned the NTSB's failure to "define the terms 'validity,' 'reliability,' and 'comparability,' or indicate what might constitute a valid, reliable, and comparable field test" when evaluating Union Pacific's test. *See* FRA Best Practices, 80 Fed. Reg. 73122, 73123 n.3. Rather than disapprove of the test, the FRA only cautioned that, to be compliant, Union Pacific was required to adhere to its own "field test *protocol*," i.e., the procedures used to carry out the test. FRA Best Practices, 80 Fed. Reg. at 73122–23 (emphasis added).

In nevertheless choosing not to give "weight" to the evidence of Mr. Campbell's and Mr. Goss's unblemished record of passing the original color vision test, the district court misconstrued the evidence to reach its conclusion and drew an unwarranted inference in Union Pacific's favor. *See Hill v. Walmart Inc.*, 32 F.4th 811, 816 (9th Cir. 2022) (on summary judgment courts must "draw[] all inferences in favor of the nonmoving party"). Because a court may "not weigh evidence on a summary judgment motion," that was reversable error. *Interstellar Starship Servs.*, 184 F.3d at 1110.

And had the court properly applied the summary judgment standard, it would have denied the railroad's motion. "Drawing all justifiable inferences in [their] favor," the fact of Mr. Campbell's and Mr. Goss's unchanged color vision after they previously satisfied a secondary color vision field test showed a "genuine issue[] of material fact" as to whether they could have again satisfied such a test when they were instead given the flawed Light Cannon test. *Vazquez v. Cnty. of Kern*, 949 F.3d

1153, 1159 (9th Cir. 2020); *see Uzun v. City of Santa Monica*, 54 F.4th 595, 595 (9th Cir. 2022) (On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). This Court should "reverse the district court's entry of summary judgment" because the undisputed evidence in favor of the plaintiffs was improperly "disregard[ed]." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015) ("revers[ing] the district court's entry of summary judgment on [a] discrimination claim" because "the district court erred in disregarding" evidence supporting plaintiff).

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
MICHAEL SKOCPOL
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA E. GARLAND
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336

JAMES H. KASTER

55

LUCAS KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
(612) 256-3200

ANTHONY S. PETRU
GAVIN SCOTT BARNEY
HILDEBRAND, MCLEOD & NELSON LLP
5335 College Avenue
Suite 5A
Oakland, CA 94618
(510) 451-6732

October 6, 2025                    *Counsel for Plaintiffs-Appellants*

56

## STATEMENT OF RELATED CASES

There is one other case pending before this Court that raises the second issue presented here:

1. *Blankinship v. Union Pacific Railroad Co.*, No. 22-16849

*/s/Matthew W.H. Wessler*
Matthew W.H. Wessler

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32-1 because this brief contains 13,196 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

October 6, 2025                               */s/Matthew W.H. Wessler*
                                              Matthew W.H. Wessler